UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE ANN SKINNER,

                Plaintiff,        Civil Action No. 15-12368
                                      Honorable Paul D. Borman
                                      Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

Plaintiff Catherine Ann Skinner ("Skinner") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [11, 12], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Skinner is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Skinner's Motion for Summary Judgment [11] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On November 19, 2012, Skinner filed an application for DIB, alleging a disability onset date of October 18, 2011.  (Tr. 144).  Skinner later amended her onset date to be September 1, 2010.  (Tr. 42-43).  This application was denied at the initial level.  (Tr. 101-04).  Skinner then filed a timely request for an administrative hearing, which was held on December 17, 2013, before ALJ Kevin J. Detherage.  (Tr. 34-83).  Skinner, who was represented by attorney Timothy Burns, testified at the hearing, as did vocational expert Kenneth Browde.  (*Id.*).  On February 7, 2014, the ALJ issued a written decision finding that Skinner is not disabled under the Act.  (Tr. 10-33).  On May 6, 2015, the Appeals Council denied review.  (Tr. 1-5).  Skinner timely filed for judicial review of the final decision on July 1, 2015.  (Doc. #1).  On January 29, 2016, Skinner filed a Motion for Summary Judgment.  (Doc. #11).  The Commissioner filed a Motion for Summary Judgment on February 22, 2016 (Doc. #12), and Skinner filed a reply on March 14, 2016.  (Doc. #13).

### B.    Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    *Skinner's Reports and Testimony*

At the time of the administrative hearing, Skinner was 46 years old, and at 5'7'' tall, weighed 240 pounds.  (Tr. 39, 144).  She lived in a house with her husband, daughter, and son-in-law.  (Tr. 40-41, 181, 609, 613).  Skinner's highest level of education is an associate's degree in early childhood development.  (Tr. 40, 610).  Her last job was at Head Start, a Northeastern Michigan Community Service Agency, where she worked approximately ten years.  (Tr. 42-43, 46).  She started working there in 1999 as a preschool teacher right out of college.  (Tr. 44-45).

In 2007, she switched to a part-time substitute teacher position. (Tr. 44, 46). She resigned in early September 2010, at the beginning of the school year. (Tr. 42, 45). The most lifting she did at that job depended on the weight of the heaviest student in the classroom – "anywhere from 30 to 80 pounds." (Tr. 45). Skinner has not applied for jobs since resigning in 2010. (Tr. 69). She did some volunteer day care for friends for just three or four hours, but afterwards she was in bed for three or four days because of the pain it caused her. (Tr. 69).

Skinner alleges disability as a result of various physical and mental conditions, including degenerative disc disease of the cervical and lumbar spine, fibromyalgia, occipital neuritis, carpal tunnel, bursitis in the right hip, depression, and bipolar disorder.[1] (Tr. 167). During the hearing, she also mentioned that she suffers from chronic migraines, headaches, chronic fatigue, vertigo, bulged discs, osteoarthritis, anxiety, and panic attacks. (Tr. 48). She has blurry vision and sees spots. (Tr. 188). She has not had any surgery for these conditions. (Tr. 63). At the hearing, she said her "whole right side" was in pain. (Tr. 52). Although where she feels the most pain varies, it was greater on that day in her lower back and hip. (Tr. 53). She described her cervical mediated headaches as "based in the neck" and "com[ing] up in on the right side of the head." (Tr. 70-71). To keep the pain down, she applies ice packs to the back of her neck at least twice a day. (Tr. 71). According to Skinner, "[she] ha[s] not had one day in the last two and a half years where [she] has not had a headache." (*Id.*). During the hearing, she was uncertain as to how to define the duration of her headaches because she has "different types" of

---

[1]

 In talking about her mental state in relation to her bipolar diagnosis, Skinner said she is "more depressive" than manic. (Tr. 65-67). Her most recent depressive period, where she stays in bed and doesn't care about anything, was two weeks before the hearing. (Tr. 67). In November 2013, she reported having a combined total of two weeks where she wasn't manic or depressive; she characterized how she felt during these two weeks as having "a pretty good day." (*Id.*). Skinner reported receiving counseling since around 2005, and that it has helped. (Tr. 68). She was attending sessions every three weeks. (*Id.*).

them.  (Tr. 72).  However, she clarified that she gets two headaches a day and they make her unable to function for two hours at a time, but by keeping an ice pack on her neck, "that brings it down to the minimum."  (Tr. 72-73).  She has trouble not falling or tripping; most recently, she fell three days before the hearing when she was getting out of the tub.  (Tr. 57).  But this fall did not result in any injury or trip to the hospital.  (Tr. 57-58).

Skinner takes the following medications:  Baclofen (a muscle relaxer); Fioricet (for migraines); Gabapentin and Norco (for pain); and Nabumetone (for inflammation).  (Tr. 170, 188).  She sets alarms to remind herself to take them, and they cause memory loss, dizziness, nausea, and weight gain.  (Tr. 183, 188).  She also gets Botox, spinal injections (every six to eight weeks in the last two years), and nerve blocks.  (Tr. 49).  She mentioned that she is trying acupuncture, which helps her headaches "[a] little bit."  (Tr. 49-50).  For her back, she uses a TENS unit and muscle relaxers.  (Tr. 50).  She did many sessions of physical therapy.  (*Id.*).  Her degenerative discs and pinched nerves are "not severe enough yet for surgery."  (*Id.*).  She also did vertigo therapy, but it was discontinued "because it wasn't helping," so she wears patches. (*Id.*).  She uses a cane, a brace for carpal tunnel, and glasses.  (Tr. 187).  If shopping for a long time, she uses a wheelchair.  (*Id.*).

Skinner testified that she can stand for five minutes, walk for about fifteen to twenty minutes,[2] and lift up to nine pounds.  (Tr. 51-52, 184).  She testified that she has trouble sitting, so the amount of time she can sit varies based on the severity of her pain and she "usually lay[s] down more."  (Tr. 52).  When she has pain in her back, she has to lay down on her left side.  (Tr.

---

[2] These estimates are from Skinner's testimony during the December 17, 2013 hearing.  (Tr. 51-52).  In her December 20, 2012 Function Report, however, she said she can walk for five minutes.  (Tr. 186).  On June 29, 2012, Gary Raymond, P.T., noted that Skinner can sit and stand for ten minutes, and walk for thirty minutes.  (Tr. 440).  On August 24, 2012, he noted that she can sit for thirty minutes, stand for fifteen minutes, and walk for twenty minutes.  (Tr. 416).

74-75).  She does this four to five times a day.  (Tr. 75).  She has trouble sleeping, so she sleeps only four or five hours a night.  (Tr. 59, 182).

Skinner can take care of her personal needs with some assistance.  (Tr. 182).  She can dress herself but needs reminders and help with straps.  (Tr. 56, 182-83).  She also needs help getting in and out of the tub.  (Tr. 182).  Household chores increase her pain and fatigue.  (Tr. 181).  She can put her laundry away, but won't do it on days where she has more pain.  (Tr. 183).  She doesn't vacuum and cannot wash dishes.  (Tr. 56, 184).  She occasionally prepares lunch, but her husband prepares breakfast and dinner.  (Tr. 183).  She used to do all the cooking at her house, but now standing "cause[s] too much pain."  (*Id.*).  She is able to pay bills, count change, handle a savings account, and use a checkbook.  (Tr. 184).  She shops in stores for groceries and personal items every couple of weeks.  (*Id.*).  She estimated that she goes outside weekly or monthly for doctor's appointments and grocery shopping.[3]  (Tr. 59, 62, 184-85).  She gets there by riding in a car, driven by her husband.  (Tr. 58-59, 62, 184).  She can't go out alone because she has a hard time concentrating and could get lost.  (Tr. 184-85).

On a typical day, she wakes up and goes downstairs to the couch and the recliner.  (Tr. 59-60).  She stretches and does five to twenty minutes on her Gazelle exercise machine.  (Tr. 182).  She gets dressed, eats breakfast, uses a heated blanket, and stretches again.  (*Id.*).  She puts ice packs on her head, neck and back; uses her TENS unit; and watches television, lies down with her eyes closed, or sleeps for a few hours.  (Tr. 59-61, 73).  She then does more stretches and uses a heating pad, adjusting positions every ten to fifteen minutes.  (Tr. 182).  She sleeps more during the day than at night.  (Tr. 60).

---

[3] Skinner testified that grocery shopping now takes her three times as long to do because pushing the cart increases her pain.  (Tr. 181).

Although she used to read, she now says she has "concentration issues with that." (Tr. 61, 76). Because of her headaches, she can't read for more than five or ten minutes without having to take off her glasses, and she can't read without her glasses. (Tr. 76). She now reads a book a month, whereas before she read a book a week. (Tr. 185). In terms of hobbies, she testified that she "[doesn't] do anything anymore." (Tr. 61). She visits her grandchildren, who live in other states, for a few hours "and that's it" because her pain increases with activity. (*Id.*). She indicated that she has problems interacting with others because her pain makes her stressed and irritable so she "rarely" goes out and "[doesn't] feel good enough to socialize." (Tr. 185-86). She no longer goes to the movies weekly or to regular family gatherings. (Tr. 186, 188). But she wrote that she interacts with others daily via phone and computer. (Tr. 185). And during the hearing, she testified that friends visit her every two or three months. (Tr. 63).

### 2. *Skinner's Daughter's Third Party Function Report*

Skinner's adult daughter, Candice Kuch, filled out a Third Party Function Report on behalf of her mother on December 21, 2012. (Tr. 192-99). She reported that Skinner has no problems with personal care and no need for reminders. (Tr. 193-94). She also stated that Skinner is sometimes able to do "small" household chores like laundry (once a week, fifteen minutes at a time) but does not prepare any of her own meals. (*Id.*). She testified that Skinner is in "constant pain" and "exhausted/tired," which makes it hard for her to complete even simple tasks. (Tr. 192). In particular, she explained that her mother "cannot stand [for] long . . . without being in too much pain." (Tr. 194). She stated that her mother can handle money, but her ability has changed because "she has less energy and patience to deal with it." (Tr. 196). According to her daughter, Skinner reads daily but only for about fifteen to twenty minutes at a time; she used to read "constantly" but now she is limited because of difficulties concentrating.

7

(*Id.*).  Although she initially said her mother goes outside once a week (Tr. 195), she later said her mother "doesn't go out weekly anymore" and only spends time with others if she can sit with her heating pad.  (Tr. 197).  She has not noticed any unusual behaviors in her mother.  (Tr. 198).

### 3.    Medical Evidence

The Court has thoroughly reviewed Skinner's medical record.  In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4.    Vocational Expert's Testimony

Kenneth Browde testified as an independent vocational expert ("VE") at the administrative hearing.  (Tr. 77-80).  The VE characterized Skinner's past relevant work as a preschool teacher as skilled in nature, Specific Vocational Preparation ("SVP") of level 7.  (Tr. 77).  He said it is light according to the Dictionary of Occupational Titles ("DOT") and heavy according to Skinner.  (*Id.*).  As for Skinner's past relevant work as a teacher aide, the VE characterized this as skilled in nature, with an SVP of 6, and light according to the DOT but heavy as performed.  (*Id.*).

The ALJ asked the VE to imagine a hypothetical individual of Skinner's age, education, and work experience that was limited to unskilled light work; can occasionally stoop, kneel, crouch, or crawl; can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can frequently handle and finger with the upper extremities; should avoid exposure to hazards such as heights and machinery with moving parts; cannot do production rate pace work; can have occasional changes in the routine workplace setting; and can occasionally rotate, flex, or extend the neck.  (Tr. 78).  The VE testified that the hypothetical individual would not be capable of performing Skinner's past work.  (*Id.*).  However, the VE testified that the individual

8

could perform the following jobs:  housekeeping/cleaner (light, unskilled, SVP 2; 162,845 jobs in the national economy); cashier (light, unskilled, SVP 2; 817,407 jobs in the national economy); office helper (light, unskilled, SVP 2; 40,296 jobs in the national economy).  (Tr. 78-79).  He further testified that this testimony is consistent with the DOT.  (Tr. 79).

The ALJ then asked the VE to imagine the same hypothetical individual, but in addition, the individual is likely to be absent from work three days per month.  (*Id.*).  The VE testified that these limitations would be work preclusive.  (*Id.*).  He testified that this answer is consistent with the DOT, except that the issue of absenteeism, because it is not addressed in the DOT, was based on his nearly three decades of professional work experience.  (Tr. 79-80).  The VE also testified that if the person needed to lie down periodically four to five times per day would be work preclusive.  (Tr. 80).  If the person was off task for more than ten percent of the day due to headaches, this would also be work preclusive.  (*Id.*).

**D.      The ALJ's Findings**

At Step One of the five-step sequential analysis, the ALJ found that Skinner did not engage in substantial gainful activity since September 1, 2010 (her amended alleged onset date).  (Tr. 15).  At Step Two, the ALJ found that Skinner has the severe impairments of degenerative disc disease of the cervical and lumbar spine; cervical radiculopathy; migraine headaches; fibromyalgia; bilateral carpal tunnel syndrome; obesity; affective disorder; and anxiety disorder.  (Tr. 15-16).  At Step Three, the ALJ found that Skinner's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 16-18).

The ALJ then found that Skinner retains the RFC to perform light work, which is unskilled, with the following additional limitations:  she can only occasionally rotate, flex, or extend her neck; she can only frequently, as opposed to constantly, handle and finger with her

bilateral upper extremities; she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but she can never climb ladders, ropes, or scaffolds; she should avoid exposure to hazards such as heights and machinery with moving parts; she is unable to perform production rate pace work; and her work can involve no more than occasional changes in a routine workplace setting.  (Tr. 18-28).

At Step Four, the ALJ concluded, based in part on the VE's testimony, that Skinner is unable to perform her past relevant work as a preschool teacher and teacher aide, which are skilled in nature, light in the DOT, and heavy as performed.  (Tr. 28).  At Step Five, the ALJ found that considering Skinner's age, education, work experience, and RFC, she can perform the following jobs that exist in significant numbers in the national economy:  cashier (817,407 jobs); housekeeping cleaner (162,845 jobs); and office helper (40,296 jobs).  (Tr. 28-29).  As a result, the ALJ concluded that Skinner is not disabled under the Act.  (Tr. 29).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

### F.     Analysis

In her motion for summary judgment, Skinner argues that the ALJ erred:   (1) in evaluating the effect of her migraine headaches at Step Three and whether she met or medically equaled Listing 11.03; (2) by improperly omitting any migraine-related limitations from his RFC finding; and (3) by failing to provide good reasons for giving little weight to the opinion of Dr. Awerbuch, her treating neurologist.  Each of these arguments is addressed below.

### 1.     *Substantial Evidence Supports the ALJ's Evaluation of Listing 11.03*

Skinner argues that the ALJ erred in determining that her migraine headaches did not meet or medically equal Listing 11.03[4] because although he found that they were a severe impairment, he did not evaluate them at Step Three.  (Doc. #11 at 6).  She also argues that the

---

[4]  The parties agree that while no listing explicitly addresses migraine headaches, it is appropriate for the ALJ to consider whether the migraines are analogous to the requirements of Listing 11.03.  (Doc. #11 at 16; Doc. #12 at 7); *see* 20 C.F.R. § Pt. 404, Subpt. P, App. 1; 20 C.F.R. § 404.1526(b)(2) ("If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments.  If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing."); Program Operations Manual System, DI § 24505.015 (providing an example where a claimant's chronic migraine headaches medically equal Listing 11.03, which was identified as "the most closely analogous listed impairment" because the findings regarding her impairment "are very similar to those of [Listing] 11.03"); *Fedarko v. Comm'r of Soc. Sec.*, 2013 WL 5353375, at *3 (N.D. Ohio 2013); *Shepard v. Comm'r of Soc. Sec.*, 2015 WL 4554290, at *4 n.3 (S.D. Ohio 2015).

As to the content of Listing 11.03, when the ALJ's decision became final upon the Appeals Council denying review on May 6, 2015 (Tr. 1-5), Listing 11.03 covered nonconvulsive epilepsy.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 11.02, 11.03 (effective Aug. 12, 2015 through May 23, 2016).  Meanwhile, Listing 11.02 covered convulsive epilepsy.  *Id.*  On July 1, 2016, the Social Security Administration combined these two "epilepsy" listings into one under Listing 11.02, thus removing Listing 11.03.  SSA-2006-0140, 2016 WL 3551949(F.R.), at *43056 (July 1, 2016).  The final rule provides that this revised listing is to be applied to "new applications filed on or after [July 1, 2016] and to claims that are pending on or after [that date]."  *Id.* at *43051.  As a result, revised Listing 11.02 is to be used on determinations and decisions issued after July 1, 2016.  *Id.* at n.6.  Moreover, the Social Security Administration establishes that it "expect[s] that Federal courts will review the Commissioner's final decisions using the rule that were [sic] in effect at the time [it] issued the decisions."  *Id.*  Accordingly, in this case, the Court will apply the requirements of "old" Listing 11.03 in reviewing the ALJ's 2015 decision because that was the listing in effect at that time.

ALJ erred because he failed to obtain a medical expert opinion. (*Id.* at 17-18). The Court finds no error warranting remand.

Skinner bears the burden of proving at Step Three that her impairments meet or medically equal a particular listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Johnson v. Comm'r of Soc. Sec.*, No. 15-449, 2016 WL 2342892, at *4 (W.D. Mich. Apr. 15, 2016) (citing *Bingaman v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 642, 645 (6th Cir. 2006) ("Plaintiff bears the burden of establishing that [she] satisfies the requirements of a listed impairment.")); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *26 (E.D. Mich. Jan. 13, 2015) (citing *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 1994)). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing," *Rabbers*, 582 F.3d at 653, and all of these criteria must be met concurrently for a period of at least twelve continuous months. *See* 20 C.F.R. §§ 404.1509, 404.1525(c)(3)-(4); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x

3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Here, to have medically equaled the criteria of Listing 11.03, Skinner had to establish that her migraine headaches are

> documented by detailed description of a typical [migraine headache],[5] including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.   With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.03 (effective Aug. 12, 2015 through May 23, 2016).

The ALJ considered this listing in his decision, concluding that Skinner's "migraine headaches failed to meet or medically equal any of the listings in section 11.00 (Neurological System) because the record does not establish evidence of any neurological deficits. Specifically, the medical evidence fails to demonstrate evidence of epilepsy or epileptic seizures (11.02 and 11.03) . . . . " (Tr. 16).  Skinner argues that the ALJ's explanation is "inconsistent with the . . . Agency policy that migraine headaches are <u>analogous to seizures</u>."  (Doc. #11 at 17) (emphasis in original).  Skinner further argues that "the fact that [she] does not 'have seizures' does not address [her] migraines appropriately."  (*Id.*).

In evaluating whether Skinner satisfied her burden as to Listing 11.03, the ALJ's decision had to provide "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record" – including whether Skinner's impairments met or medically equaled Listing 11.03.  5 U.S.C. § 557(c)(3)(A).  However, "[a]n

---

[5] Stedman's Medical Dictionary defines a migraine as a "familial, recurrent syndrome characterized usually by unilateral head pain, accompanied by various focal disturbances of the nervous system, particularly in regard to visual phenomenon, such as scintillating scotomas." *Migraine*, *Stedman's Medical Dictionary* 554080 (revised 2014).

ALJ does not have to cite to every piece of evidence to show [he] considered it . . . or arrange the decision in a particular manner to show [he] analyzed the evidence." *Gower*, 2015 WL 163830, at *28 (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006); *Jones v. Barnhart*, 364 F.3d 501, 505 (3rd Cir. 2004)).   While it might be preferable for an ALJ to explicitly tie his discussion of a relevant listing's elements to specific medical evidence, the Sixth Circuit "has allowed courts to scan the decision for statements that support the step three analysis, and numerous district and circuit courts have agreed" on this.   *Johnson v. Comm'r of Soc. Sec.*, No. 13-14797, 2015 WL 730094, at *26 (E.D. Mich. Feb. 19, 2015).   Thus, "a court can find the listing analysis sufficient by looking at the entire opinion," rather than limiting its review to any particular section of the ALJ's decision.   *Id.*   As a result, "an ALJ need not fully discuss the Step III findings so long [as] 'the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that the Plaintiff did not meet the requirements for [the] listing.'"   *Vandenboss v. Comm'r of Soc. Sec.*, No. 14-12283, 2015 WL 3823558, at *5 (E.D. Mich. June 18, 2015).

A review of the ALJ's decision as a whole makes clear that he appropriately considered evidence in the record that supports his Step Three analysis.   He considered that in September 2011, Skinner complained of headaches to Michael Ogboh, D.O.   (Tr. 19).   He also considered that in January 2012, Skinner reported having a five-day headache to Darla Mays, PA-C, and said she "periodically" got headaches like this, where the last time was in August 2011, "but it did not last this long."   (*Id.*).   The ALJ considered that Mays assessed that Skinner had a "tension headache," with tenderness at the right occipital notch and decreased range of motion in her cervical spine and when turning her head to the right.   (*Id.*).   The ALJ also considered the opinion of Phillip Henning, D.O., who saw Skinner one week later and diagnosed Skinner with

cervicogenic mediated headaches from cervical spondylosis. (Tr. 19-20). The ALJ noted that Skinner attended physical therapy between January 2012 through February 2012 for her pain and headaches. (Tr. 20). He also noted that in May 2012, Skinner reported to Steven Schultz, M.D., that she had recurrent headaches since June 2011. (*Id.*). The ALJ reviewed that Dr. Schultz assessed Skinner with recurrent cervicogenic headaches, and as a result, she underwent repeat radiofrequency neurotomies of the right third occipital nerve and right C3-4 medial branch. (*Id.*). The ALJ noted that by late May 2012, Skinner told Dr. Schultz that "her headaches improved following this procedure." (*Id.*).

In addition, the ALJ considered that in March 2013, Erik Sinka, D.O., assessed Skinner with "probable cervicogenic headaches and episodic migraines without aura." (Tr. 21). The ALJ considered that during Dr. Sinka's neurological evaluation, Skinner told him that she was experiencing headaches every one or two months that lasted two to three days. (*Id.*). Although she reported having a more severe headache starting in February 2013, the ALJ noted that she said this had been "somewhat diminished" by an epidural steroid injection at C7-T1. (*Id.*). He also noted that Skinner acknowledged that her headaches were "under good control" with Fioricet, which gave her no side effects. (*Id.*).

Furthermore, the ALJ considered the August 2013 assessment of Gavin Awerbuch, M.D., who opined that Skinner had "chronic daily migraine headaches." (Tr. 22). The ALJ also took note of the fact that during a follow-up appointment that month, Skinner told Dr. Awerbuch that Botox injections had reduced her headaches "by perhaps 85 or 90%." (*Id.*). He considered that one month later, Skinner said the Botox has helped her migraine headaches "immensely." (*Id.*). He also considered that in October 2013, she told Dr. Awerbuch that her migraines are "better controlled" with Botox. (Tr. 23). The ALJ mentioned that in November 2013, Skinner told Dr.

Awerbuch that she recalled having only one or two major headaches since her last injection. (*Id.*). He pointed out that Skinner said the Botox had been "helpful" in managing her migraine headaches, which had improved by "about 90%," and that Dr. Awerbuch concluded that her headaches were "well controlled." (*Id.*). The ALJ discussed that "[a]s recently as December 2013," Skinner reported to Dr. Awerbuch that her headaches have been "under much better control." (*Id.*). The ALJ also mentioned Dr. Awerbuch's notes that Skinner's husband said she was "functioning at a higher level and doing more activities and getting out," even though there were still days where "she is in quite a bit of pain." (*Id.*).

On top of this, the ALJ considered the conclusion of Scott Baker, M.D., that Skinner's vertigo symptoms might be linked to her migraine headaches. (Tr. 22). The ALJ also noted that in October 2013, Mark Ginther, M.D., found that Skinner had headaches and exhibited "some photophobia." (Tr. 23).

Skinner argues that her testimony highlights the ALJ's error at Step Three, in particular, her statement that "the primary way in which her migraine headaches affect her . . . is that when she has a severe headache she must absent [her]self from what she is doing, and lie down in a dark, quiet room until the headache subsides."[6] (Doc. #11 at 15). But Skinner does not identify what portion of Listing 11.03 this relates to. Nor does she elaborate on how her migraines meet

---

[6] In making this argument, Skinner does not provide a citation for this statement. (Doc. #11 at 15). But in the previous subsection of her motion that summarizes her testimony, she cites to Dr. Awerbuch's records in discussing her "quite frequent[]" need to "lie in a dark room for several hours." (*Id.* at 9) (citing Tr. 553, 555, 562, 568). The objective medical evidence in the record provides little support on this issue. For instance, on November 19, 2013, Dr. Awerbuch did mention that when Skinner gets a migraine headache, "she becomes incapacitated and must lie in a dark room and sleep for hours." (Tr. 549). But this seems to refer to Skinner's condition prior to her Botox treatment, and on that date, she reported that the Botox has been "helpful" in treating her migraines, which have improved "by about 90%." (*Id.*). Furthermore, this statement regarding lying in a dark room and sleeping for hours was Skinner's subjective account; Dr. Awerbuch's objective findings do not elaborate on any need or requirement that she do this. (*Id.*). On the contrary, he periodically recommended that she stay active. (Tr. 536, 547, 561).

or medically equal any of the other requirements of Listing 11.03.[7]   Without making this showing, this argument fails.   For the reasons explained above, the ALJ appropriately considered the evidence in the record regarding her migraines.[8]

Substantial evidence supports the ALJ's finding regarding Listing 11.03.   Evidence is lacking that Skinner's migraines meet the listing's criteria that they occur more than once a week even after at least three months of prescribed treatment.   20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 11.03 (effective Aug. 12, 2015 through May 23, 2016).   Although Skinner cites to her hearing testimony that she gets two headaches a day and that each one lasts two hours at a time (Doc. #11 at 7) (citing Tr. 72), she says on that same page of her hearing testimony that she has a "hard time defining the full duration" of her headaches because she has "different types" of them.   (Tr. 72).   Thus, it is unclear whether this frequency refers to her migraine headaches or other types of headaches.

Moreover, the record does not support her assertion that she gets two headaches a day, for two hours at a time.   On September 15, 2011, Skinner reported a history of headaches "associated with photophobia, sonophobia, smell sensitivity and a lot of features of migraine" but explained that her "current" headaches do not have any of those features.   (Tr. 314).   On January 2, 2012, Skinner had a five-day headache that was "severe" and "constant," but she said that the last time she had one like that was five months earlier, in August 2011.   (Tr. 306).   On March 19, 2013, Dr. Sinka noted that Skinner's "current medications" included Fioricet, which

---

[7] As the Commissioner points out, even though Skinner "devotes a significant portion of the brief to a recitation of medical evidence, . . . she makes no targeted attempt to correlate this evidence to the criteria" of Listing 11.03.  (Doc. #12 at 6).

[8] The Court also notes that although the ALJ appropriately considered Skinner's migraines in light of Listing 11.03, at the same time, "migraine headaches are not a listed impairment and therefore the ALJ [is] not *required* to consider it at step three."  *McClain v. Comm'r of Soc. Sec.*, No. 14-159, 2014 WL 5765518, at *5 (S.D. Ohio Nov. 5, 2014) (emphasis added).

was used as needed for "migraine[s] for three days every two months."  (Tr. 529-30).  On November 19, 2013, Dr. Awerbuch recorded that Skinner could "recall only having one or two major headaches since her last [Botox] injection," which had been helpful in managing her migraine headaches; he noted that her headaches had "improved by about 90%."[9]  (Tr. 549).  Based on the information in the record, her previous Botox injection was on September 18, 2013, which means she experienced one or two major headaches (possibly migraines) in two months.  (Tr. 556) ("We will proceed with Botox again since this has helped her . . . migraines.").

As to the listing criteria regarding alteration of awareness or loss of consciousness, Skinner was awake, alert, and oriented to person, place, and time.  (Tr. 235, 237, 239, 281, 295, 301, 308, 317 (finding no confusion), 319, 322, 416, 418, 520, 526 (also finding no mental disturbances), 536-37, 547, 554).  Other medical records indicate that she was awake, alert, and oriented times three (Tr. 255, 261, 267); her speech was clear and coherent (Tr. 308, 536); and she had appropriate affect and mood.  (Tr. 268, 526, 536-37, 556 (no aberrant behaviors noted)).  There are also findings that she experienced no dizziness, fainting, or seizures.  (Tr. 261, 267, 306, 421, 511).  She denied alteration of consciousness, syncope, vision loss, and visual disturbances such as blurred or double vision.  (Tr. 306, 421, 511, 557, 559).  Thus, substantial evidence supports a finding that Skinner did not meet this criteria of Listing 11.03 either.  Accordingly, Skinner has not met her burden of showing that her migraines meet or medically equal all of Listing 11.03's requirements.

Finally, Skinner argues that the ALJ erred in failing to obtain a medical expert opinion as to whether she met or medically equaled Listing 11.03.  (Doc. #11 at 17-18).  "When a claimant

---

[9] Dr. Awerbuch noted that Skinner's headaches "occur anywhere from 15 to 20 times per month" and last "usually four to five hours to an entire day."  (Tr. 549).  But these numbers seem to refer to her headaches before she started to receive Botox injections.  Prior to this appointment, Dr. Awerbuch examined Skinner on August 20, 2013, and found that the Botox had reduced her headaches "perhaps by 85 or 90%."  (Tr. 557).

has a listed impairment but does not meet the criteria, an ALJ can find that the impairment is 'medically equivalent' to the listing if the claimant has 'other findings related to [the] impairment that are at least of equal medical significance to the required criteria.'" *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *8 (E.D. Mich. Feb. 21, 2014) (quoting 20 C.F.R. § 416.926(a)).  To that end, Social Security regulations mandate "that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." *Soc. Sec. Rul. 96-6p*, 1996 WL 374180, at *3 (July 2, 1996); *see also Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (noting that "[g]enerally, the opinion of a medical expert is required before a determination of medical equivalence is made").  But the Sixth Circuit has held that where the evidence in the record supports the ALJ's conclusion, "there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing." *Gower*, 2015 WL 163830, at *26 (quoting *Retka*, 70 F.3d 1272, at *2); *Johnson*, 2015 WL 730094, at *25 (quoting *Retka*, 70 F.3d 1272, at *2).  The Sixth Circuit has instead "shifted the focus to 'the claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment.'"  *Id.*  "Consequently, an ALJ's Listing analysis must be viewed in light of the evidence the claimant presents."  *Id.*

Here, as explained above, substantial evidence supports the ALJ's finding that Skinner's migraines did not meet or medically equal Listing 11.03.  Skinner has not met her burden of demonstrating otherwise, and thus the ALJ did not err in not obtaining a medical expert opinion. *Bracey v. Comm'r of Soc. Sec.*, No. 10-12659, 2011 WL 3359678, at *3, 5 (E.D. Mich. July 13, 2011).

20

For the reasons explained above, the ALJ's determination that Skinner's migraine headaches did not meet or medically equal Listing 11.03 is supported by substantial evidence.

> 2.    *Substantial Evidence Supports the ALJ's RFC Determination*

Skinner argues that the ALJ's RFC determination is flawed because it failed to account for her all of her limitations – in particular, those resulting from migraines, "such as the decrease in ability to concentrate or the need to lie in a dark room." (Doc. #11 at 18-20; Doc. #13 at 4). She argues that the ALJ should have considered that her migraines "cause her to be off task at unpredictable times, and for an unpredictable length[] of time." (Doc. #11 at 18). A review of the record, however, shows that the ALJ committed no error with respect to this issue.

Skinner highlights no clinical evidence or medical opinions that would warrant imposing any RFC limitations resulting from her migraine condition. On the contrary, the record shows that although Skinner had a history of migraine headaches, Botox injections were "immensely" helpful in treating them. (Tr. 555). On March 19, 2013, Dr. Sinka recorded that Skinner's migraines were "under good control." (Tr. 529). Taking Fioricet, which caused no side effects, kept her headaches under control and prevented them from becoming incapacitating. (*Id.*). On August 2013, Dr. Awerbuch noted that Botox reduced her migraines by 85 or 90%. (Tr. 557). On September 18, 2013, Dr. Awerbuch wrote that she reported "improved functional abilities and increased activities of living with the treatment." (Tr. 556). On November 19, 2013, her headaches had improved by around 90%. (Tr. 549). On November 26, 2013, Dr. Awerbuch opined that her headaches were "well controlled." (Tr. 551). On December 3, 2013, he concluded that she "seems to be doing fairly well," and her headaches "have been under much better control." (Tr. 547). Moreover, her husband told Dr. Awerbuch on that date that despite having days where she is in pain, "she is functioning at a higher level and doing more activities and getting out." (*Id.*).

Skinner's assertion that she was unable to concentrate or needed to lie in a dark room is not supported by substantial evidence in the record. *See supra* note 6. On November 3, 2011, she reported no weakness, no fatigue, and no decreased activity. (Tr. 279). On January 2, 2012, she again reported no weakness and no decreased activity and also denied dizziness or visual disturbance. (Tr. 306). Two weeks later, on January 17, 2012, she reported that despite difficulties with sitting, standing, doing household chores, sleeping, and childcare, she was living at home, where she was "able to take care of [her]self with no extra care needed." (Tr. 235-36). Later that month, on January 27, 2012, she reported a 10% improvement with her activities of daily living. (Tr. 238). On April 18, 2012, she exhibited normal mood, judgment, and insight. (Tr. 262). On May 31, 2012, she denied any weakness or lack of coordination. (Tr. 286). More than once, she attended doctor's appointments on her own. (Tr. 279, 299, 317). On June 28, 2012, she reported a 40% improvement; although she needed to pace herself, she had decreased pain and increased ability to perform activities of daily living. (Tr. 416). In July and August 2012, she reported that sitting, standing, walking, and her ability to do housework were "all improving." (Tr. 418, 438-39 (stating that housework was "easier" to do). During this timeframe, her prognosis for achieving her goal of decreasing pain and resuming normal activities of daily living was "good." (Tr. 438).

On March 13, 2013, she reported doing exercises or stretching regularly. (Tr. 588). Later that month, on March 19, 2013, she elaborated on this and some other daily activities: she said that even though she spends time using ice packs, she also exercises on a Gazelle machine for ten minutes, twice a day (previously it was twenty five minutes, twice a day); does some stretches; reads occasionally; uses the computer; and does laundry. (Tr. 610). On a different occasion, she reported exercising daily for ten years. (Tr. 617). In August 2013, her functioning

22

was "improving" and Dr. Awerbuch encouraged her to "stay active" and stressed the importance of "regular aerobic conditioning exercises." (Tr. 536, 561). On September 18, 2013, Skinner reported to Dr. Awerbuch that she had adequate pain relief and improved functional abilities and increased activities of daily living with treatment. (Tr. 556). On December 3, 2013, Dr. Awerbuch again encouraged Skinner to "stay active." (Tr. 547).

Moreover, Skinner has identified no objective medical evidence suggesting that, in a given day, she would be off task. Nowhere in the RFC Statement, or elsewhere in the record, does Dr. Awerbuch address off-task time or assign a percentage to Skinner's inability to perform activities. (Tr. 543-546). Skinner's other medical providers do not address off-task time either. Even if they had, statements by a treating physician that a claimant is unable to work "are entitled to no deference because the determination of disability is a matter left to the Commissioner." *See Stojic v. Comm'r of Soc. Sec.*, 2015 WL 9238986, at *4 (W.D. Mich. 2015) ("Here, Dr. Antinozzi's predictions of how often Plaintiff would likely be off task and miss work were conjecture, not a medical opinion.").

As laid out above, the ALJ sufficiently discussed (in approximately three and a half pages, single spaced) the medical evidence related to Skinner's migraine condition in his decision to support his RFC determination. (Tr. 19-23); *see supra* pp. 16-18. The ALJ also considered her treatment history and activities of daily living. As for her treatment history, he noted that she reported using a TENS unit and taking baclofen, gabapentin, nabumetone, and Norco to treat her pain and that these medications cause her to have dizziness, nausea, and memory loss. (Tr. 23). He noted that she takes Fioricet to treat her migraine headaches and that she uses a non-prescription cane for help with balancing and walking. (*Id.*). With respect to her activities of daily living, he found her to be mildly restricted. (Tr. 17). He arrived at this

conclusion by reviewing Skinner's statements in her Function Report of her engaging in an array of daily activities, such as driving short distances, grocery shopping, preparing simple meals, performing light household chores, doing laundry, exercising (including using a stationary bike), and using a computer. (*Id.*). He also reviewed statements indicating that she managed her own money, lived with family, visited her grandchildren, attended family gatherings, occasionally spent time with her friends, spoke with others on the phone, read, and watched television. (Tr. 25). In addition, the ALJ reviewed Skinner's daughter's Third Party Function Report, finding that her statements "generally corroborate[] these activities of daily living." (*Id.*).

In sum, the Court agrees with the Commissioner that in making his RFC determination, the ALJ took the limitations resulting from Skinner's migraines into account, (Tr. 27) (explicitly listing migraines as one of the impairments he considered in formulating an RFC that reflected her limitations), and appropriately considered her "history of treatment, the objective imaging studies, the clinical examination findings, and [Skinner's] reported activities of daily living." (Tr. 28). Thus, Skinner's critique of the ALJ's RFC lacks merit; the ALJ was able to "consider all evidence without directly addressing in [his] written decision every piece of evidence submitted by [Skinner]." *Kornecky*, 167 Fed. Appx. at 508; *see Bethke v. Comm'r of Soc. Sec.*, 2016 WL 6211729 (E.D. Mich.), *adopted by* 2016 WL 1266606 (2016).

For the reasons explained above, the ALJ's RFC determination is supported by substantial evidence.

### 3. The ALJ Properly Evaluated the Opinion of Treating Physician Dr. Awerbuch

Skinner argues that the ALJ's RFC is also "legally insufficient" because the ALJ failed to provide "good and specific reasons for giving 'little weight' to Dr. Awerbuch's medical

opinion."[10]   (Doc. #11 at 21-22).   Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"   *Blakley*, 581 F.3d at 406 (internal quotations omitted).   While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.   *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."); 20 C.F.R. § 404.1527(c)(2).   If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."   *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).   "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons . . . for the weight . . . give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor

---

[10] Skinner argues that "all medical opinions do not stand on equal footing; rather, treating *specialist* opinions are generally accorded the most weight, while treating and examining sources are generally favored over non-treating and non-examining sources."  (Doc. #11 at 21) (emphasis in original).  But although 20 C.F.R. § 404.1527(c)(5) provides that "generally . . . more weight" is given "to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist," this added weight applies to an analysis of specialist versus non-specialist opinions and does not necessarily trump all other considerations.  For instance, this provision must be considered along with the provision that "[g]enerally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

Dr. Awerbuch, Skinner's treating neurologist, filled out a Medical Assessment of Ability to do Work-Related Activities (Physical) ("RFC Statement") on December 3, 2013. (Tr. 543-46). On that form, Dr. Awerbuch simply circled numbers indicating that Skinner can sit, stand, and walk for half an hour without interruption; and that in an eight-hour workday, Skinner can sit for two hours, stand or walk for one hour, and sit/stand as needed for one hour. (Tr. 543). Where asked to detail supportive medical findings, he wrote "see office notes." (*Id.*). He checked spaces indicating that she can occasionally climb stairs but never bend, twist, reach above shoulder level (on both sides), squat, kneel, climb ladders, crouch, crawl, and stoop. (Tr. 545). He indicated that these findings were also supported by his notes. (*Id.*). He opined that Skinner's balance, feeling, and vision are impacted by her impairments – but not her hearing. (*Id.*). Although he indicated that her vision is limited because of migraines, he left the space to add supportive medical findings blank. (*Id.*). He wrote check marks indicating that since 2009, she can occasionally lift or carry (unassisted) five pounds, but never ten pounds or more. (Tr. 544). The medical findings backing this conclusion are somewhat difficult to read but seem to be related to her cervical condition and ulnar neuritis. (*Id.*). He opined that she can occasionally perform simple grasping and fine manipulation with both hands (the supportive medical findings are unclear); never push or pull ten or twenty pounds with her hands; and is not able to use her feet and legs for repetitive movements such as to operate foot controls. (*Id.*).

Dr. Awerbuch opined that Skinner needs to lie down up to four times during an eight-hour workday. (Tr. 543). He also opined that due to her condition, she would be unavailable or absent more than four days per month. (*Id.*). The supportive medical findings for this

conclusion were "multiple problem[s]," but he did not specify which ones.  (*Id.*).  He opined that these limitations have been in effect since 2008.  (*Id.*).  He wrote check marks indicating that she should avoid unprotected heights, moving machinery, temperature extremes, chemicals, dust, fumes, noise, cars, being outside in cold or wet weather, vibration, and humidity because it will aggravate her migraines, among other conditions.  (Tr. 545).  At the end of the RFC Statement, he provided some additional information about her condition and limitations:  she cannot use a keyboard and should avoid driving (without referencing medical findings that support these opinions, as prompted by the question); future surgery or hospitalization is not being contemplated because it "won't help"; and subjective complaints are consistent with the objective medical findings.  (Tr. 546).

The ALJ specifically considered Dr. Awerbuch's RFC Statement, evaluating it as follows:

> I give little weight to Dr. Awerbuch's opinion because the substantially limiting restrictions he proposed are without substantial support from the medical evidence and the record as a whole, including his treatment notes suggesting symptomatic improvement, the findings of other medical professionals, and [Skinner's] reported activities of daily living.  Indeed, it appears that Dr. Awerbuch relied quite heavily on [Skinner's] subjective report of symptoms and limitations, and seemed to uncritically accept as true most, if not all, of what [Skinner] reported in formulating his opinion. Yet, as explained above, there exist good reasons for questioning the reliability of [Skinner's] subjective complaints.

(Tr. 26).  The ALJ also explicitly considered Dr. Awerbuch's treatment notes, evaluating them as follows:  "Notably, Dr. Awerbuch's findings of limitation are generally inconsistent with the findings of other examining physicians, including Dr. [Sivasupiramaniam] Sriharan, who had evaluated [Skinner] just two weeks earlier."  (Tr. 22).

In giving little weight to a treating source's opinion, "the ALJ must provide 'good reasons' for [doing so], reasons that are 'sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *5).  In this case, the ALJ recognized Dr. Awerbuch as a treating physician who saw Skinner between August and December 2013 and gave good reasons for affording "little weight" to his opinion regarding Skinner's limitations.  (Tr. 22-23).  The ALJ appropriately found Dr. Awerbuch's RFC Statement to be inconsistent with the objective medical evidence and the record as a whole, specifically, (1) his own treatment notes "suggesting symptomatic improvement"; (2) the findings of other medical professionals; and (3) Skinner's reported activities of daily living.  (Tr. 26).  Skinner argues that these are "conclusory remarks" that do not provide "good and specific reasons" for giving Dr. Awerbuch's opinion "little weight." (Doc. #11 at 22).  She also argues that the ALJ "erroneously concluded that Dr. Awerbuch's opinion was not well supported by the record."  (*Id.* at 23).  But the Court finds the ALJ's reasoning sufficient and that the ALJ's decision to give little weight to Dr. Awerbuch's RFC Statement is supported by substantial evidence.  *Francis*, 414 Fed. Appx. at 805 (finding that where the ALJ gave "no weight" to a treating physician, an appropriate explanation was for him to cite the medical opinion's inconsistency with the objective medical evidence, the claimant's conservative treatment and daily activities, and the assessments of the claimant's other physicians because "[p]rocedurally, the regulations require no more").

Dr. Awerbuch's own treatment notes do not provide objective medical evidence to support his assessment of Skinner's functional limitations in the RFC Statement.  Instead, his treatment notes suggest that Skinner's condition improved and therefore support the ALJ's finding.  On August 13, 2013, following an injection procedure (40 mg of Depo-Medrol and 3 cc of 0.25% Marcaine injected into the occipital notch area and along the nuchal ridge), Skinner

"reported immediate relief" of her head and neck pain to Dr. Awerbuch.  (Tr. 563).  That same

month, on August 20, 2013, she reported that Botox had "reduced her headaches by 85 or 90%."

(Tr. 557).  Although she had cervical pain that was allegedly severe and "at times" interfered

with her activities of daily living, Dr. Awerbuch did not prescribe her an assistive device[11] or

order that she restrict her movement; instead, he gave her a cortisone injection.  (Tr. 557-58).

This procedure had "no complications" and Skinner tolerated it "well."  (Tr. 558).  According to

Dr. Awerbuch, "[t]here was at least 50% relief of pain almost immediately."  (*Id.*).   On

September 18, 2013, Skinner reported that the back injection had "helped her pain immensely"

and Botox had helped her dystonia and migraines.  (Tr. 555-56).  Dr. Awerbuch noted that "[h]er

medicines do help control her symptoms where she can be more functional."  (Tr. 555).  More

specifically, his notes say that Skinner "report[ed] adequate pain relief and . . . improved

functional abilities and increased activities of living with treatment," with "no aberrant behaviors

noted."  (Tr. 556).  On that date, Dr. Awerbuch conducted an examination of Skinner's pattern

shift visual evoked response; the results were normal on both sides.  (Tr. 566).

On November 19, 2013, Skinner again reported to Dr. Awerbuch that Botox was

"helpful" in managing her cervical dystonia and migraine headaches, and that both conditions

had improved by about 90%.  (Tr. 549).  A week later, Dr. Awerbuch noted that Skinner's

headaches were "well controlled" and that "facet injections have been quite helpful . . . in

reducing her pain by about 85%."  (Tr. 551).  He administered additional facet injections with

"no complications" and wrote that Skinner "reported at least 50% improvement of pain."  (Tr.

551-52).  On December 3, 2013, Skinner reported that she was doing home acupuncture and that

---

[11] On August 6, 2013, Dr. Awerbuch "recommended" that Skinner use a back brace to help reduce pain.  (Tr. 561).  However, it was to be worn "only intermittently . . . when performing weightbearing activities" that would cause increased pain and "in conjunction with core strengthening exercises."  (*Id.*).  Dr. Awerbuch explained to Skinner that using it on a "constant basis" would "actually cause muscle weakness and reduce functioning."  (*Id.*).

this was also "helping." (Tr. 547). She once again commented that the cervical fact injections had been "extremely helpful." (*Id.*). Dr. Awerbuch recognized that Skinner has "chronic longstanding cervical pain," where X-rays and MRIs have "shown changes consistent with multilevel cervical facet syndrome." (Tr. 547-48). But he also found that Skinner was doing "fairly well" and encouraged her to "stay active," for instance, through independent home exercises such as isometric strengthening, range of motion, stretching, and aerobic conditioning. (Tr. 547). He noted that her headaches "have been under much better control." (*Id.*). And he also noted that Skinner's husband stated that despite days of being in pain, "she is functioning at a higher level and doing more activities and getting out." (*Id.*). Dr. Awerbuch gave her a cortisone injection with "no complications" and noted that "[t]here was at least 50% relief of pain immediately." (Tr. 548). He noted that Skinner tolerated the procedure "well." (*Id.*).

Moreover, Dr. Awerbuch's RFC Statement as to Skinner's functional limitations is at odds with the opinions of other medical professionals in the record. Although Dr. Sriharan only saw Skinner once to determine her candidacy for surgical intervention, he found on July 24, 2013 that Skinner was awake, alert, and oriented times three; her cranial nerve examination II through XII was normal; her motor examination was "mostly good"; she had a hypersensitivity over the right arm with no loss of sensation; her reflexes were "preserved" (testing negative for Hoffman's reflex); despite some hypersensitivity in the right thigh, she otherwise had good strength, sensation, and deep reflexes in her legs; there was no evidence of myelopathy; she had some degenerative changes and foraminal narrowing in her cervical spine, but "overall the degree of narrowing [was] quite minimal and certainly not of a surgical nature"; there was "not . . . a whole lot of mild degeneration of the dis[c]" in her lumbar spine; and her MRI brain scan was negative. (Tr. 503). As Skinner pointed out (Tr. 51), he found that there was no need for

surgery.  (Tr. 503) ("All in all at present, I am not really seeing anything significant from a surgical standpoint.").  He also opined that there was "a lot of pain exaggerated behavior that [he] could not correlate with physiological or anatomic abnormalities perceived on scans."  (*Id.*).  He recognized that although she was in chronic pain, there were "other non-physiological factors that play[ed] into her overall pain and pain perception."  (*Id.*).

Dr. Sriharan's opinion is in line with those of other medical providers.  On September 8, 2011, Dr. Ogboh found that Skinner had normal muscle tone and bulk; full motor strength (five out of five); and symmetric tendon reflexes.  (Tr. 315).  Skinner's sensory exam for superficial touch, vibration, and proprioception was normal and symmetric.  (*Id.*).  Her coordination – finger to nose, rapid alternating movements, and fine finger movements – was normal.  (*Id.*).  Her stance and cadence were normal, and she had no difficulty walking tandem or standing, including the Romberg test.  (*Id.*).  Dr. Ogboh noted that Skinner's neck movement was not particularly limited, "but [Skinner] feels there is pain subjectively."  (*Id.*).  In reviewing an MRI of her brain, he concluded that "she does not have any specific neurologic deficits."  (Tr. 314).  On November 3, 2011, Mays noted that Skinner was alert and oriented; in no acute distress; had no deformity; and had normal gait.  (Tr. 281).  On November 30, 2011, Timothy J. Laing, M.D., similarly found Skinner to be in no acute distress.  (Tr. 257).  Her musculoskeletal exam was "benign"; her pulses were normal; her deep tendon reflexes were intact bilaterally; her cranial nerves were intact; and her circulation appeared normal.  (*Id.*).  Although he opined that she continues to have fibromyalgia, he stated that he was "not sure why she is having a severe shooting pain and tingling in her right arm and leg."  (*Id.*).

In January, March, and April 2012, Dr. Henning found that Skinner had full strength in her upper and lower extremities.  (Tr. 250, 252, 255, 288, 290, 291).  In January 2012, he noted

31

that she was awake, alert, and oriented times three; in no acute distress; had normal bipolar gait with no evidence of antalgia or ataxia; could heel and toe walk without difficulty; had a normal standing flexion test; and her sensation and deep reflexes were equal and symmetric throughout her bilateral upper extremities.  (Tr. 255).  He noted similar findings in March 2012.  (Tr. 252, 291).  Dr. Henning indicated that she should try to do an aerobic exercise program.  (Tr. 252, 292).  On April 18, 2012, Caramarie C. Brock, PA-C, found that she had practically full muscle strength and tone in her bilateral upper and lower extremities, and normal reflexes.  (Tr. 262). On April 25, 2012, Avery M. Jackson III, M.D., made similar findings.  (Tr. 268).  He also noted that Skinner did not use an assistive device.  (Tr. 266).  On May 3, 2012, Dr. Schultz recorded that Skinner had normal cervical range of motion "in all spheres" and that a neurologic examination of her lower extremities – including strength, sensation, and deep tendon reflexes – was normal.  (Tr. 415).  On May 31, 2012, Dr. Schultz noted similar findings.  (Tr. 286).

On February 26, 2013, Skinner denied having back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, and arthritis.  (Tr. 526).  She also denied having transient paralysis, weakness, paresthesias, seizures, syncope, tremors, and vertigo.  (*Id.*). Results from a physical examination indicate that she was alert and oriented to person, place, and time; was in no acute distress; had full range of motion (flexion, extension, and lateral rotation) in her cervical spine without pain; and had normal strength in all of her muscle groups.  (*Id.*). Discharge notes from that day say she was able to ambulate "without difficulty"; had no dizziness or lightheadedness; denied weakness or numbness; was alert and oriented; may resume normal activities; and was advised against bed rest.  (Tr. 528).  On March 19, 2013, Skinner was advised to get regular exercise.  (Tr. 576).  Medical records indicate that she had normal motor

tone, strength, and pronator drift; and normal gait and station.  (Tr. 577).  On April 12, 2013, Dr. Ginther noted that the strength in all of her muscle groups was normal.  (Tr. 521).

A review of additional evidence in the record also supports the ALJ's RFC determination.  With respect to her activities of daily living, in her December 20, 2012 Function Report, Skinner testified that she does stretches and exercises multiple times a day and is able to take care of her personal needs with some assistance.  (Tr. 182, 588).  She testified that she can heat up a frozen meal two to three times a week and put laundry away twice a week.  (Tr. 183). Skinner leaves her house approximately once a week, and although she generally rides in a car, she is able to drive for a short period of time.  (Tr. 184).  Skinner indicated that her visual limitations involve her wearing glasses and that she has no hearing problems or problems with touch, taste, or smell.  (Tr. 619).  She indicated that she is able to handle money and go shopping for groceries and personal items every couple of weeks.  (Tr. 184).  She also indicated that she spends her time reading (albeit slower than she used to); talking to others via phone and computer; and occasionally visiting with friends.  (Tr. 63, 185).  Skinner's daughter's Third Party Function Report is mostly consistent with Skinner's.  Her daughter, however, indicates that Skinner is able to do "small" household chores and has no problems with personal care.  (Tr. 193).  *Francis*, 414 F. App'x at 805-06 (recommending that the claimant's motion for summary judgment be denied where the claimant prepared meals, managed his finances, and helped with various chores, in part, because "all that the substantial-evidence standard demands" is that "a reasonable person could deem [the claimant's] activity levels as more consistent with the view that he is suffering manageable impairments than the view that he is experiencing severe limitations").

In sum, the ALJ provided sufficiently specific "good reasons" that make it clear he gave little weight to Dr. Awerbuch's RFC Statement because he found it was inconsistent with the evidence in the record, namely, Dr. Awerbuch's own treatment notes, the opinions of other medical providers, and Skinner's self-reported activities of daily living. *Rogers*, 486 F.3d at 242 (quoting *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at \*5). As explained above, these "good reasons" are supported by substantial evidence in the record. *Francis*, 414 F. App'x at 806 (substantial evidence supported ALJ's decision to reject treating doctor's opinion where the ALJ cited "specific conflicts between [the] opinion and substantial medical, lifestyle, and opinion evidence," and so "we look no further into [the decision's] merits").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [12] be GRANTED, Skinner's Motion for Summary Judgment [11] be DENIED, and the ALJ's decision be AFFIRMED.


Dated: December 16, 2016                    s/David R. Grand
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431

F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 16, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager